So we shall here. So we'll start with the day calendar coin versus Amchan. This isn't working. Just make sure. Thank you. How we doing? Good. Thanks. Good morning, Mr. Brennan. Good morning. May it please the court. The district court. Erred in finding that dr. Coin was not an original source and the district court erred in finding that the complaint did not properly allege a submission of false claims. The reason the court made these errors was that the courts gave improperly gave the benefit of inferences to Amgen rather than to dr. Coin first with respect to the original source issue the 2010 amendment to the original source definition in the False Claims Act, which appears at 31 USC 3730 e4b and is quoted at page 32 of our opening brief applies to at least some of the claims in this case, and I think there's no dispute about that. Under that definition, an original source is one who contributes significant additional information to that, which has been publicly disclosed. So as to improve its quality, there's a circuit split on this, isn't there? As to whether the amendment is retroactive believe that is correct. I know that the Seventh Circuit held that the that the amendment is retroactive. A number of courts have held that other parts of the of the public disclosure bar are not retroactive. But you're saying that at least of a question of whether there was see enter a falsity that that came after 2010. That there was knowledge of what I'm saying is that there was knowledge of the falsity before and after 2010 and that there was and that there were false claims submitted before and after 2010. So before I wanted to make that point before I got to the retroactive issue to say that even if the statute is not read to apply retroactively, some of Dr. Coyne's claims will be subject to the 2010 amendment. Now there is not, I don't believe, any disagreement among the parties or the lower court about essentially what it takes to satisfy the 2010 amendment to be an original source. The issue instead in this case, I believe, is did the complaint adequately allege, or did the complaint plausibly allege that Dr. Coyne is original source? What was Dr. Coyne an original source of given the requirement that this fit in the exception because it was FOIA available? What is it that he did that you say meets even the 2010 requirement? In response to that, Your Honor, I will point to, briefly, point to paragraphs 72, 74, and 87 of the complaint discussed in my opening brief at 37 to 40 and in my reply at 10 to 13. And that question gets to my view that the district court gave the benefit of inferences in favor of Amgen. Okay, but tell me, you haven't been citing me. Absolutely, Dr. Coyne gave a medical presentation on behalf of Amgen in 2003. Amgen provided Dr. Coyne with information in order to make that presentation. And the presentation was designed, among other things, to encourage providers to promote epigen to a target of above 11 grams per deciliter of whole blood. Now, at that time, the NHT, the normal hermetic rat trial, existed. And we've alleged, demonstrated that there is no benefit to quality of life. However, the materials that Dr. Coyne received did not make any, from Amgen, made no mention of the normal hermetic rat trial. Instead, it relied solely on associational data, okay? As a result, and that is information that Coyne brings directly from his interactions with Amgen and a reasonable fact finder. But following up on Judge Calabresi's question, the information that you're talking about was known to the government. Indeed, your client elicited it by a FOIA request. Okay. The information, the NHT was known to the FDA, okay? There's no evidence that it was known to CMS, and we have alleged that it was concealed from CMS. And CMS makes the- Well, in 2007, the label was revised to say just what you're saying was concealed from them. Presumably, they read the label, and they haven't changed their practice in IOTA. So that, I think, goes to the issue of materiality. But it also goes to the issue of what it is your client unearthed that the government didn't know, and that would have caused the government to deny all of these claims. First of all, the practice did change, I think, in 2011, okay? Second, with respect of- The label, I think, was changed in 2007, but it could be 2011. No, you're correct in 2007, but I believe in about 2011, CMS stopped paying for epigen in order to raise hemoglobin levels above 11. Okay. That was later on. What did Dr. Coyne add? What Dr. Coyne added was evidence that Amgen knew that its claims with respect to epigen and improving quality of life were false. Now, on that point, there seems to be a circuit split. One circuit, the first, says it's just the fraud, not the knowledge. Another, the seventh, I may have reversed, says the opposite. You want us to say that knowledge of C-enter is by itself enough, that the knowledge that there was C-enter is sufficient to support Vicuitan? I believe that's correct, Your Honor. What I would say is that Amgen's knowledge of the falsity of its promotion is part of establishing violation of the False Claims Act, and that is evidence that he brings to the table based on his direct- But I want to go back. I can understand in some circumstances where the fact that one part of the government knows doesn't mean that another one does. But is that just automatic, or is the situation here that you're talking about sufficiently related things so that you can assume that if one knows, that isn't really going to be a big deal to have somebody come in and tell you that another one was doing something else? Do you see what I'm saying? I do, and I think that goes right to the heart of the case. The district court essentially said, look, knowledge of one part of the government, I'm paraphrasing, means knowledge of any part, okay? Amgen says, well, no. They kind of get to your question and say, well, FDA's knowledge under these circumstances equates to CMS's knowledge. There's no support for that. There's no reason to believe that. There is no reason to, the complaint alleges that Amgen concealed from CMS the NHT data when it had a duty to speak. And the, may I finish answering my question? I'm down to zero seconds. Okay, thank you. At a time when CMS had a duty to speak, there is no reason to believe and every reason to not believe that CMS had access to the NHT data. And on a motion to dismiss, the inference should certainly be in favor of the relator. Well, assuming, as apparently is the case, that FDA approval for that portion of the label that deals with indication and usage, which is not the portion you're talking about, which is sort of the quality of life portion. But assuming that FDA approved the indication and usage, which it must have, then isn't that deemed to be presumptively reasonable and necessary? By the Medicare and Medicaid people? I think the answer to that is no. The Medicare people have the right to accept and rely upon and what Amgen calls the default rule of just saying, okay, if FDA said it, we'll go along with it. But they don't have to. And in this case, our allegations, well pleaded, are that they would not have gone along had they known the truth. How can you know whether this nostrum was being prescribed to improve quality of life or to reduce anemia? It was regularly, the best answer I can give you is this, Judge. It was regularly promoted, aggressively promoted as a means to improve quality of life. And to the extent that- Doesn't reduction in anemia improve quality of life? Who wants to be anemic? Quality of life is, I guess, what you would- It's a term of art. Term of art, yes. And there are certain factors and parameters that, it's an objective measurement of what is quality of life. You've reserved a couple minutes rebuttal. Yes, sir. So we'll hear you then. Thank you, Your Honor. Thank you. May it please the court. Good morning, Your Honors. David Rosenblum on behalf of Defendant Appali, Amgen, Inc. Turning to the original source issue, I'd like to begin by addressing the retroactivity issue the court raised. The district court properly noted that because even the more generous 2010 standard, Dr. Coyne could not prevail on that, the court did not need to reach retroactivity. Dr. Coyne alleges that the one case that has found retroactivity, the Seventh Circuit, did so based on the notion that this was simply a clarification, not a change of the law. But if that's true, it's singularly surprising that he does not describe or recite to any of the robust law in this circuit that preexisted that clarification. And this case is exactly like Schindler Elevator, which was decided under the 1986 version, which is a direct and independent knowledge. And it almost, you couldn't think of a case more on fours with that case, like the Relator and Schindler Elevator, Dr. Coyne had a suspicion, and so he made a FOIA request. Can direct, and is it enough for the direct and independent knowledge to be direct and independent, that he knew that it was promoting something for a, for a dubious purpose? Not in this case, because the allegation and the complaint is that that is learned from the material that he received from the government. His interpretation of that study- I thought he said he learned it because he was, he was part of the promotion. No, and he actually- I thought that opposing counsel said that sometime after 2010, he was told to give a speech which promoted in a way that was not true, and told, in effect, that it was not true. No, what the- That's what he said. He said, but if you look at his brief, it's actually paragraph 72, it's in 2003. And what he alleges, if you look at page nine of his reply, he says all those three paragraphs, he allege, show Amgen's knowledge that, knowledge that it was not, I apologize, I want to cite this correctly. Intended to show that Amgen knew that its presentations regarding quality of life were false. But we know from the brief and from the complaint itself, he alleges paragraph 38 and paragraph 47, he specifically alleges at paragraph 38. The reason he thinks Amgen knew the statements in the label about quality of life were false, because of his interpretation of the normal hematocrit study. He says, based on the results of that study, Amgen knew. So he's not adding anything. And to come back to the materiality point, he needs to win, excuse me, the retroactivity point. Dr. Coyne ignores all the prior- On that point, counsel argues or counsel suggests that it's undisputed that the 2010 amendment applies to at least some of the claims, is that correct? That is not correct, because there is no claim whatsoever identified in this case. Assuming there is a claim, I mean, is it your position that the 2010 amendment applies to none of the claims? The 2010 amendment would apply if there was a false claim described after March 23rd of 2010. Let's be clear though, to carry his point that he wins under the 2010 amendment and that it is retroactive, he must show that he wins under this old case law, Crindler versus Crindler, where it says it's not enough to have suspicion. I don't understand. I thought he was saying that after 2010, before the government knew, he knew that what they were doing after 2010 was fraudulent, and he materially added that. Now, that's what he's saying. Now, you keep saying retroactivity, fine, but I want to know about that. What is it after 2010 that he says he added and that you say he does not? Nothing is referred to. The only thing he identifies in his complaint after 2010 is a discussion about the FOIA response. It's at paragraph 87. And he says, I discussed it with somebody named Dr. Unger, who has some unstated role at the FDA. And we discussed that I'm interpreting this data in a certain way. And then Dr. Unger says something about an article that Amgen didn't write. To be clear, that is not independent of and does not materially add to the core of this case, which is his interpretation of the FOIA response. And so to be clear, he cannot come and look at that 2010 interpretation and say it's retroactive because it would change the result. The Supreme Court has twice said, in the Graham County case and the Hughes Aircraft case, if applying a new standard would change the result and remove a key TAM defense, it cannot be applied retroactively. That's why I started out, Your Honor, with nothing before 2010 helps him unless he wins under a direct and independent knowledge standard, which he doesn't even try to do. So he comes in and he says, well, what about after March 23rd, 2010? The only thing he's identified are a 2003 presentation, which has no relevance to Amgen's knowledge. If the court looks at the allegations in paragraph 72, it says nothing about Amgen's knowledge of falsity. He tries to add that knowledge again by bringing in the FOIA response. It has to be independent of and materially add to that FOIA response. He says, I made this presentation. Everybody agrees it was an unlabeled presentation. If the court looks in the record to his June 13th letter to the court below, June 13th, 2016, he says there is no allegation of off-label promotion in this case. And so in 2003, the only allegation is that- What do you mean by off-label? He is saying that the label has two pieces to it. One is indications, which was approved by the FDA, and the other is quality of life, which is the basis of the claim that this was fraudulent. And actually, it's not the basis of the claim in the complaint. It is the basis of the argument in response to the motion to dismiss. But just like Your Honor wrote in Polanski, the approved indication is to treat anemia by raising hemoglobin to 10 to 12. The other part of the label to which he refers, which says response to epigen and clinical experience, talks about the rise of rate of hemoglobin and says- Are you arguing that it wouldn't matter if Amgen, knowing that above 11, was doing nothing, even if it were approved by the FDA, and it pushed to do more than 11, that this would not be a fraud, even though the more than 11 caused CMS to pay, which they otherwise would not have done? Because that seems to me a difficult argument for you to make. If there is that, then the question is, does this fellow tell us something about that between 11 and 12 that CMS did not know on the basis of his own particular knowledge? He does not, Your Honor, because of the reason for which this drug was approved and the reason for which CMS paid. In this case, anemia is a deadly disease. It increases the risk of death and the need for transfusion, which causes all sorts of illness. This drug was approved to treat anemia by raising hemoglobin 10 to 12, and to reduce the risk of transfusion. And that's the only reason for which it was paid. And all of the statements about- But how do you know that? Because I just heard your adversary say that it was promoted to improve quality of life for people who are anemic, and therefore, no one knows the extent to which, presumably like discovery, no one knows the extent to which this was prescribed only for the quality of life advantage. Actually, there's no, under an American medical response case, there is no specific who, what, where, when, and why 9B of any sort of allegation of promoting like that. There is no specific claim, and we have no unique knowledge. But if there was a discussion of an unlabeled dose of 11 to 12 and a reference of to quality of life, the question would be under the False Claims Act, is that a false or fraudulent claim, and is it material? And for the reasons your honor pointed out, we know it is not. And the relator never deals with, either in the reply brief or anywhere, his failure to address the falsity in paragraph 77 of the complaint, where he ignores what your honor pointed out. Which is since 2007, FDA and CMS clearly have known. There's no allegation of quality of life benefit on the label. Quality of life was eliminated as a useless term. There's no reference after 2007 to any quality of life. It's still approved to treat anemia by going to 10 to 12, and CMS is still paying for it for the same reason that the record is clear. The only approved use, the only basis of payment, there is no allegation. May I continue with the response? Go ahead. There is no allegation of any communication where CMS said it was going to reimburse this drug for quality of life. And he actually, at paragraph 62 of the complaint, talks about quality of care, which has nothing to do with. His argument is that he knows that Amgen, your client, promoted it as a quality of life in some elixir. And he knows that because he was enlisted to do it. No, he actually alleges that in 2003, they made a promotion that was consistent with the label. And that would still be, there's nothing false or fraudulent. But that claim to say that you should dose to 11 or 12, because some independent guidelines reflect that, there's no falsity. CMS is prepared to pay that claim. It's an unlabeled, I'm sorry, Your Honor. I want to come back to one thing, and I'm not saying that this is what happened. But what I want to know is whether you're arguing that if there was a claim by Amgen that this was useful for quality of life to go beyond 11. When they knew that it was not useful for quality of life, whether that claim, if the plaintiff was the one to have seen that it was there and that Amgen knew was false, would be enough. Or are you saying that that would not be enough because it was still underneath the 12 that was permitted? I just want to know what your argument is, because you seem to be going back and forth between that isn't what was done, that isn't what he knew, all of which I can understand, and this would not be a claim because it was still under the 12th. And I want to be clear which it is you're arguing. Two things I'm arguing. The first is that he would not be an original source to that claim because his evidence of what Amgen knew is based on his reading of the report he got from the government. The second point I am making is that the false claims statute, which would require a false claim, which would be a submission of a non-reimbursable claim, if a physician treated anemia 10 to 12 based on their determination that that's what was needed to treat it. It may be that FDA or CMS would have other causes of action, but the Supreme Court has recently, as Escobar has said, not every potential claim of a misrepresentation of the government is a false claim. And to be material here, as in Polanski, there would need to be some representation of something that was false or fraudulent as to the reimbursement and just as in the Polanski case. So you are making the argument that even if there was a false advertisement of a part of Amgen to use this for quality of life between 11 and 12. And that this fellow knew of that, and no one else knew it, that that would not be enough for a quitam? I mean, you're making other arguments which may be good, but I find that a rather difficult argument. Whatever may have been implied in Polanski, but I've read Polanski and I don't think it requires that at all. I am saying, Your Honor, that if there was a representation as to the quality of life benefit of a drug, and I want to emphasize again, there is no allegation of any such representations after 2007 when quality of life is not part of any discussion, reimbursement or otherwise. That there would be possible claims by the government directly for misrepresentations to the government, but there would not be for a relator such as Dr. Coyne to come in with information he's received from the government and claim that they had paid for a claim as to which that was false or fraudulent, because they pay only to treat the quality of life, to say that he could have just as easily said the normal hematocrit study shows that you don't sleep well or you're less depressed. That wouldn't have made it non-reimbursable. Thank you. Thank you. Brennan will hear rebuttal. Thank you. I want to run through a few points quickly. Number one, there was no rule nine argument made at the district court. Council mentioned that. Number two, I wanted to clarify something. It was in 2003 that Dr. Coyne provided what you call an advertisement promoting this drug. And it was at that time that he learned that Amgen was not relying on the NHT data. Now the NHT data, we allege, demonstrated there was no improvement in quality of life. The 2003 presentation that Dr. Coyne gave based on Amgen materials demonstrates that Amgen knew. Otherwise, why would they have used associational data and not data from the normal hematocrit trial? That's what's significant about the 2003 promotion by Dr. Coyne. With respect to 2000- What did he add that's independent of the NHT data? Now you're getting to the 1986 version of the statute. Well, while I'm asking this question- I think, okay, no, I apologize. What is independent of the NHT data, if anything? I would say that what I just described was independent of the NHT data. Did it relate to it in some sense that he gets the data years later? You just described as if Amgen knew that it didn't materially improve the quality of life. Correct. And that is- I think it's independent in the sense that it establishes- I'm having a hard time with this question, Judge, and I apologize. It's independent in the sense that it demonstrates Amgen's knowledge of falsity as opposed to the NHT data, which simply demonstrated, I would say, falsity. That the NHT data, read correctly, demonstrates that there is no improvement in quality of life. Thank you. Thank you. Thank you both. Okay. We will reserve decision. Thank you, your honors.